**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

USDC- GREENBELT
'26 SEP 2 AM8:31

JOSHUA J. SWAIN,

Plaintiff, *pro se*,

v.

ZOWIE BARNES, *et al.*,

Defendants.

Civil Action No. 1:25-cv-02575-LKG

Dated: September 1, 2026

# MEMORANDUM OPINION

## I. INTRODUCTION

Plaintiff *pro se*, Joshua J. Swain, who was previously incarcerated at the Baltimore County Detention Center ("BCDC"), filed this civil rights complaint, as supplemented, pursuant to 42 U.S.C. § 1983 against Defendants "BCDC Admin S. Verch," Walt Pesterfield, Hilary Siakor-Sirleaf, Jennifer Magin, "Baltimore Co., MD"[1] (collectively, "County Defendants"), PrimeCare Medical Inc., and Zowie S. Barnes, M.D. (collectively, "Medical Defendants").[2] ECF Nos. 1, 6, 7, 9, 11, 13-15, 19, 22, 27, 28, 31, 36-39, 42, 64, 69 and 76. The County Defendants filed a motion to dismiss. ECF No. 44. The Medical Defendants each filed a motion to dismiss, or alternatively for summary judgment. ECF Nos. 51 (PrimeCare Medical Inc.'s motion) and 52 (Barnes' motion). Swain filed a declaration (ECF No. 56) and was advised that the Court would consider the declaration as an opposition to the Motion when the dispositive motions were considered. ECF No. 81. He was also provided additional time to file any further response in opposition (ECF No. 81), but to date has failed to do so. Upon review of the motions and applicable law, the Court deems a hearing unnecessary. *See* Local Rule 105.6. (D. Md. 2025). For reasons that follow, the Defendants' motions will be granted.

---

[1] Mr. Swain's motion to amend the name of Defendant "The Municipality of Baltimore Co." to "Baltimore Co., MD" was previously granted. ECF No. 50.

[2] The Clerk will be directed to amend the docket to reflect the Defendants' full and correct names.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Plaintiff's Allegations

Mr. Swain filed this civil rights complaint (ECF No. 1), which he later supplemented. ECF Nos. 6, 7, 9, 11, 13-15, 19, 22, 27, 28, 31, 36-39, 42, 64, 69 and 76.[3]

Mr. Swain asserts that he has an active prescription for medical marijuana to control his epilepsy, which he cannot access at BCDC. ECF No. 1 at 4; ECF No. 9. He states that his prescription has been documented and was provided to him by his neurologist, Dr. Krauss. ECF No. 1 at 4. He alleges that the policy which denies him access to medical marijuana and CBD[4] violates his rights under the Eighth Amendment. *Id.* In response to a grievance filed by Mr. Swain, he was advised, among other things, that PrimeCare does not prescribe CBD to treat brain injuries. ECF No. 9-3 at 2. As relief, he seeks to be seen by a neurologist and to be awarded monetary damages for his pain and suffering. ECF No. 1 at 5.

Additionally, Swain claims that his rights have been violated under the Americans with Disabilities Act ("ADA") because he was placed on medical alert due to his seizures and not allowed to work to earn credits toward reducing his sentence. ECF No. 6 at 1; ECF No. 38; ECF No. 39. He further claims that he was not allowed to go to the gym or participate in general population activities due to his disability and that no alternative accommodation was offered. ECF No. 6 at 1; ECF No. 42; ECF No. 42-1; ECF No. 64; ECF No. 76. A response to Mr. Swain's request for reasonable accommodation appears to have been delayed due to the request being forwarded to the wrong individual and the ADA Coordinator position being vacant. ECF No. 76 at 4-5. Ultimately, when Mr. Swain was consulted regarding his requests for ADA accommodation, he declined to move forward with his request. *Id.* at 5.

---

[3] Many of Mr. Swain's supplemental filings concern BCDC staff and issues that are not properly before the Court. *See, e.g.*, ECF No. 7 (complaining about interactions with Sgt. Neal); ECF Nos. 13, 31, 36, 37, 38 and 39 (complaining about disciplinary proceedings); ECF Nos. 14-1 and 14-2 (documents regarding disciplinary proceedings); ECF No. 14-3 (letter from another inmate complaining about his medical care); ECF No. 15 (complaints about commissary bag); ECF No. 19-2 (concerns about how his inmate account is administered); ECF No. 69 (seeking to preserve camera footage); ECF No. 11 at 3-4 and ECF No. 27 (detailing unsanitary conditions of confinement); ECF No. 11 (complaints about housing). These claims are not properly before the Court and are not considered in the context of this case. If Mr. Swain believes his rights were violated as to any of those issues he may file a separate civil rights complaint identifying the Defendants he wishes to sue and the facts supporting his claims as to each Defendant.

[4] Cannabidiol (CBD) is a compound found in cannabis. *See* About CBD, U.S. Centers for Disease Control and Prevention, https://www.cdc.gov/cannabis/about/about-cbd.html (last visited Aug. 27, 2026).

Mr. Swain also argues that he has been unable to secure copies of his medical records without payment of a copying fee. ECF No. 11 at 2. He provides documentation regarding his efforts to obtain copies of his complete medical files at no charge. ECF Nos. 7-1 and 9-1. In his supplemental filings, he continued to complain about not having copies of his medical files but also explained that he had reviewed those records. ECF No. 9. In other filings he references his receipt of copies of his medical records and provided copies of portions of those records to the Court. ECF No. 19-1; ECF No. 22; ECF No. 22-1; ECF No. 27-1.

**B. The Defendants' Response**

On May 13, 2025, Mr. Swain underwent an intake screening at BCDC. ECF No. 51-3 at 1 and 9; ECF No. 51-4 at 1. At that time, it was noted that he had a seizure disorder for which he was taking Clobazam, Briviact and Aptiom. *Id.* That same day, Dr. Barnes entered an Order that Mr. Swain would be provided those medications daily during diabetic rounds. ECF No. 51-3. During Mr. Swain's mental health screening his history of suicidal ideation and present thoughts of harming others were recorded. *Id.* at 2. At that time Mr. Swain reported a history of smoking medical marijuana to control his medical condition. *Id.* at 5. He exhibited signs of active psychosis and suffered from "unspecified schizophrenic disorder." *Id.* at 4 and 6. In light of the foregoing, Mr. Swain's suicide risk was assessed as "high" and he was placed on suicide watch. *Id.* at 3-4.

Over the next several days Mr. Swain mentioned to staff that he needed his seizure medication, CBD, and attributed his placement on suicide watch to his not having CBD; he stated that he believed the facility wanted him to have seizures. ECF No. 51-3 at 40-43.

Mr. Swain was evaluated by Dr. Barnes on May 19, 2025, during a sick call. ECF No. 51-3 at 16 and 33; ECF No. 51-4 at 2. Mr. Swain reported that he used CBD oil to control his seizures and his treating neurologist, Dr. Gary Kraruss of Johns Hopkins Hospital, would confirm his need for CBD oil. *Id.* The following day Dr. Barnes requested Mr. Swain's medical records from Dr. Krauss. ECF No. 51-4 at 3-4. On May 21, 2025, Dr. Barnes received and reviewed Mr. Swain's medical records from Dr. Krauss. ECF No. 51-3 at 33. Those records reflected that Mr. Swain reported to Dr. Krauss that he took CBD oil in addition to other medications. *Id.*; ECF No. 51-4 at 5. Because the records were unclear as to whether CBD had been prescribed, Dr. Barnes called Dr. Krauss' office and left a message seeking clarification. ECF No. 51-3 at 18 and 33; ECF 51-6 at 5. That same day Mr. Swain was seen at his cell and

asked about the use of CBD oil for his seizures; he was advised that his neurologist had been contacted regarding the need for CBD oil. ECF No. 51-3 at 7. Dr. Krauss' office returned Dr. Barnes's call on May 22, 2025, and advised that Mr. Swain was not prescribed CBD oil but had obtained it from a dispensary. ECF No. 51-3 at 19 and 33.

On May 29, 2025, a medical code was called for Mr. Swain who reported experiencing a seizure. ECF No. 51-3 at 34; EF No. 51-6 at 4. When medical staff responded to M. Swain's cell, he was found sitting on his bunk. *Id.* His examination was normal and he did not show any signs of having had a seizure; no one witnessed him having a seizure. *Id.* Medical personnel attempted to take Mr. Swain's vital signs but he became argumentative and stated that the exam was unnecessary if he could not receive his CBD oil. *Id.*

The following day, Mr. Swain placed a sick call stating he kept having seizures and had fallen out of bed; however, when the nurse came to see him, he refused to be evaluated. ECF No. 51-3 at 20, 32; ECF No. 51-4 at 6. He was alert and showed no signs of distress and complained that it was "pointless" for him to be seen for sick call when he was not being given the CBD. *Id.* He was advised that medical could not prescribe CBD oil. *Id.*

Mr. Swain was seen on June 5, 2025, by the psychology department during which he complained that he should be moved to the medical or mental health tier, because where he was housed was not safe due to his frequent seizures; he stated his Eighth Amendment rights were being violated. ECF No. 51-3 at 43. The provider reviewed Mr. Swain's chart and noted that his seizures "do not appear to be as frequent as he is reporting." *Id.*

Dr. Barnes evaluated Mr. Swain on June 9, 2025, at sick call where Mr. Swain advised that his neurologist would send a letter regarding his CBD oil and medical marijuana prescriptions. ECF No. 52-4 at 7-8. He also attached a note suggesting that Dr. Barnes contact his neurologist so that she could "avoid some of the federal and state lawsuits coming from Eighth Amendment violations." *Id.*

The next day Mr. Swain was seen by a nurse for a variety of issues. ECF No. 51-3 at 34; ECF No. 51-6 at 3-4. During this encounter Mr. Swain threatened to sue the facility because he could not get CBD oil to treat his seizures. *Id.* On June 11, 2025, Mr. Swain asked to see Dr. Barnes to discuss his seizure medication and their administration. ECF No. 51-3 at 21. Dr. Barnes saw Mr. Swain but she noted he was argumentative and aggressive. *Id.* at 34. Dr. Barnes advised Mr. Swain that the times he could receive his prescribed medications at mealtimes and

despite his request, the schedule would not change. ECF No. 51-3 at 34; ECF No. 51-6 at 3.

Later that day, Mr. Swain reported suffering a seizure between 11:00 p.m and 7:00 a.m but there were no witnesses, despite Mr. Swain being housed in a dorm. Nevertheless, he was brought to medical by custody staff and again seen by Dr. Barnes. ECF No. 51-3 at 35. The examination was normal and Dr. Barnes noted Mr. Swain would continue to receive his prescribed seizure medication. She also documented that he was not to be housed alone due to his reported seizures and was to be housed on a bottom tier in a bottom bunk. *Id.* Mr. Swain again asked for CBD but Dr. Barnes advised that his neurologist confirmed that he was not prescribed CBD. *Id.* Mr. Swain stated that his neurologist would send a letter. *Id.*

On June 12, 2025, Mr. Swain requested copies of his medical records and was advised that the cost would be $245.50. ECF No. 51-3 at 22 and 36.

The next day Mr. Swain reported to custody staff that he did not feel safe on his unit and had thoughts of self-harm. ECF No. 51-3 at 36. Mr. Swain was taken to medical where he complained that he wanted to be transferred to another tier because he did not believe the tier where he was housed was appropriate for his seizure disorder. *Id.* He was placed on suicide watch. *Id.*

On June 15, 2025, a follow-up risk assessment was conducted. ECF No. 51-3 at 8. Mr. Swain stated that he was no longer suicidal. He exhibited signs of paranoia and stated his belief that there were toxins in the water and the facility wanted him to have seizures. *Id.*

On June 24, 2025, Mr. Swain was again seen by medical. ECF No. 51-3 at 36. He reported a history of gastroesophageal reflux disease (GERD) and that medical marijuana effectively managed his symptoms. *Id.* The next day he asked to be screened for H-Pylori. *Id.* at 24 and 36.

A psychiatric provider evaluated Mr. Swain on July 16, 2025. ECF No. 51-3 at 44; ECF No. 51-6 at 9-10. Mr. Swain complained that he could not get medical THC for his seizures and the seizures caused his entire body to shake. *Id.* He reported falling out of bed and not remembering anything and the only thing that would help was CBD oil. *Id.* He admitted that officials at the Jessup prison where he had previously been incarcerated also did not permit him to use CBD or THC. *Id.* The psychiatric provider reviewed Mr. Swain's medical records from a hospitalization in July of 2023 where Mr. Swain complained of chest pain after using cocaine. ECF No. 51-3 at 44; ECF No. 51-6 at 8-9. Those records indicated that Mr. Swain reported

using CBD to control his seizures and asked the doctor at Hopkins if he would permit Mr. Swain to take his CBD from home while hospitalized, but the request was denied as against hospital policy. *Id.* Thereafter, Mr. Swain complained about receiving anti-seizure medication when all he wanted was CBD.[5] *Id.*

On July 29, 2025, Dr. Barnes entered a note in Mr. Swain's chart indicating he would remain on his prescribed anti-seizure medications, and those medications would be reordered. ECF No. 51-3 at 25.

Mr. Swain was seen by the psychiatric provider on July 31 and August 13, 2025. ECF No. 51-3 at 45; ECF No. 51-6 at 8. During the July visit, Mr. Swain reported that he was anxious because he could not access his CBD and his neurologist had told him CBD was medically necessary to treat his seizure disorder. *Id.* During the August visit, Mr. Swain told the provider he was filing a lawsuit against the facility and he believed the jail was hiding the presence of H. Pylori. *Id.* He also stated that the was having "at least" daily seizures and they would not stop until he was provided CBD. *Id.* Lastly, he complained that he was not housed on the medical tier where he could be watched for seizures. ECF No. 51-3 at 45; ECF No. 51-6 at 6-7.

On August 15, 2025, Mr. Swain was evaluated after a medical code reported he was found shaking in his bed. ECF No. 51-3 at 37. When medical personnel examined him, he was alert and oriented, sitting on his bed and he advised staff that he has seizures every day and CBD "works for him." *Id.*

On August 18, 2025, Mr. Swain advised medical personnel that he had history of seizures and had recent seizure activity. Dr. Barnes instituted gym and work restrictions as well as bottom bunk and tier restrictions. ECF No. 51-3 at 10. She also ordered that Mr. Swain be housed with a cellmate or with a camera in his cell. *Id.*

On August 20, 2025, Mr. Swain complained that copies of his medical records would cost $241.50 and they should be provided to him for free. ECF No. 51-3 at 27. A few days later he

---

[5] Other records from Johns Hopkins note that in March of 2023, Mr. Swain was hospitalized for seizure activity. ECF No. 51-4 at 9-11. Mr. Swain was belligerent to staff because they would not allow him to use his home supply of CBD. He was prescribed Briviact, Aptiom, Clobazam and Lacosamide but Mr. Swain told staff that the only thing that helped him was CBD and he would throw away any prescription medications given to him. *Id.*

complained to the medical records department that they would not respond to his request for copies of his medical records and he submitted another request. *Id.* at 28-29.

A psychiatric provider evaluated Mr. Swain on September 9, 2025. ECF No. 51-3 at 46. Swain reported an increase in daily seizures and that he was getting a letter from his neurologist that he needs CBD for his seizure disorder. *Id.* Mr. Swain stated that he was not sure if his prescription of Gabapentin had increased his seizure activity. The provider noted that this would not be an expected outcome of adding Gabapentin to his existing antiseizure medication regimen but he would need to taper and discontinue the Gabapentin. *Id.* Additionally, she noted that she would not assess the seizure disorder because she had not observed any of Mr. Swain's seizures and there had been no suggestion of a "post ictal state" (the period after a seizure) in their prior encounters. *Id.*

Another medical code was called for Mr. Swain on September 10, 2025, where again he reported having a seizure. ECF No. 51-3 at 38. Once again, no signs or symptoms of seizure were apparent. *Id.* Mr. Swain reported that he would continue to have seizures until he was given medical marijuana. *Id.* Dr. Barnes recorded that due to Mr. Swain's complaints of daily seizures, he would be housed in a single cell that would be monitored by a camera, and he would continue to receive his prescribed seizure medications. ECF No. 51-3 at 13, 38; ECF No. 51-6 at 1-2. On September 13, 2025, Dr. Barnes updated Mr. Swain's chart and noted that no seizure activity had been observed while he was housed in the monitored cell. She ordered his return to his previous housing unit. ECF No. 51-3 at 13, 30 and 38.

Additionally, Dr. Barnes specifically denies ever preventing Mr. Swain from accessing health services or failing to treat his symptoms. ECF No. 51-5 at ¶ 6. She explains that during his incarceration, his seizure disorder was treated by administering three prescribed medications daily, which were the same medications Mr. Swain reported taking prior to his detention. *Id.* at ¶ 7. Dr. Barnes avers that THC and CBD cannot be dispensed at the detention center. *Id.* at ¶ 8. Additionally, Dr. Barnes explains that, based on her review of Mr. Swain's medical record and communications with his treating neurologist, neither THC nor CBD was recommended or prescribed to Mr. Swain to treat his seizure disorder. *Id.* Lastly, Mr. Swain was housed on medical observation for his protection due to his reports of daily seizures. *Id.* at ¶ 9.

## III. LEGAL STANDARDS

The County Defendants assert that the complaint should be dismissed, pursuant to Fed. R.

Civ. P. 12(b)(6). ECF No. 44. They argue that the complaint as supplemented must be dismissed against them, because Mr. Swain failed to assert sufficient facts against any of the individually named County Defendants to support a claim and he failed to state a viable claim pursuant to *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

The Medical Defendants each assert that the complaint should be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6) or, in the alternative, that summary judgment should be granted pursuant to Fed. R. Civ. P. 56. ECF Nos. 51 and 52. Defendant PrimeCare Medical, Inc. argues that Mr. Swain failed to allege sufficient facts to plead a cause of action against them and also failed to allege sufficient facts demonstrating a policy or custom of PrimeCare which caused a violation of Mr. Swain's constitutional rights. ECF No. 51-1. Dr. Barnes argues that Mr. Swain failed to state a claim for deliberate indifference to his medical needs, and alternatively she is entitled to summary judgment as a matter of law. ECF No. 52-1.

**A. Fed. R. Civ. P. 12(b)(6)**

Under Fed. R. Civ. P. 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the Court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293, 299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable, and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ is the Answer Ministries, Inc. v. Balt. Cnty., Md.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the Court must accept the allegations as true and draw all reasonable inferences in favor of the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765, 777 (4th Cir. 2022). But the Court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda*

*Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista, Va.*, 917 F.3d 206, 212 (4th Cir. 2019)). The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

"[P]ro se filings are 'h[e]ld to less stringent standards than formal pleadings drafted by lawyers.'" *Folkes v. Nelsen*, 34 F.4th 258, 272 (4th Cir. 2022) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the Court must construe pro se pleadings liberally. *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 1376 (2021). But "liberal construction does not require [the Court] to attempt to 'discern the unexpressed intent of the plaintiff[;]'" the Court need only "determine the actual meaning of the words used in the complaint." *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (quoting *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006) (en banc). Thus, a *pro se* complaint "still 'must contain enough facts to state a claim for relief that is plausible on its face.'" *Thomas v. The Salvation Army S. Territory*, 841 F.3d 632, at 637 (4th Cir. 2016) (quoting *King v. Rubenstein*, 825 F.3d 206, 212, 214 (4th Cir. 2016) (quoting *Twombly*, 550 U.S. at 570)).

**B. Conversion**

The Court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6) and 12(d); *see also* Fed. R. Civ. P. 10(c). The Court also may consider judicially noticed facts and documents integral to, and explicitly relied on, in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015); Fed. R. Evid. 201(b). When the parties present and the Court considers matters outside the pleadings on a Rule 12(b)(6) motion, the Court must treat the motion as one for summary judgment under Rule 56, and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

The Court notified Mr. Swain that he had the right to respond to the Medical Defendants' motions, that the motions could be construed as motions for summary judgment, and that if he did not file a timely and adequate response, the Court could rule in the Defendants' favor. ECF Nos. 54 and 55. Moreover, the Defendants' motions, which identify summary judgment as

possible relief, provided sufficient notice for Mr. Swain to have a reasonable opportunity to present relevant evidence in support of his position. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 260-61 (4th Cir. 1998). Mr. Swain opposed all of the Defendants' motions and was provided an opportunity to file a further opposition response. Thus, the Court is satisfied that Mr. Swain has been advised that the Medical Defendants' motions could be treated as motions for summary judgment and that he has been given a reasonable opportunity to present materials in response to the motions. The Court will resolve the motions under Rule 56, if appropriate.

**C. Fed. R. Civ. P. 56**

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To meet its burden, the party must identify "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" in support of its position. Fed. R. Civ. P. 56(c)(1)(A). Then, "[t]o avoid summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The opposing party must identify more than a "scintilla of evidence" in support of its position to defeat the motion for summary judgment. *Id.* at 251. The Court "should not weigh the evidence." *Perkins*, 936 F.3d at 205 (quoting *Anderson*, 477 U.S. at 249). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," then summary judgment is proper. *Id.* (quoting *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir. 1991)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, this Court "view[s] the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Perkins*, 936 F.3d at 205 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996)).

## IV. ANALYSIS

### A. Personal Participation

In a suit arising under 42 U.S.C. § 1983, the doctrine of respondeat superior generally does not apply and liability attaches only upon a defendant's personal participation in the constitutional violation. *See Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). Liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). A private corporation is not liable under Section 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondeat superior. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999); *Clark v. Md. Dep't of Pub. Safety and Correctional Servs.*, 316 Fed. App'x 279, 282 (4th Cir. 2009).

To state a claim for supervisory liability under Section 1983 based on a subordinate's conduct, the plaintiff must allege that: (1) the supervisor had actual or constructive knowledge that subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff;" (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Mr. Swain does not allege any facts suggesting that any of the individually named County Defendants were personally involved in the alleged constitutional or statutory violations. Mr. Swain's bald claim in his initial complaint that all of the Defendants were responsible for "jail policy" (ECF No. 1), is insufficient to state a claim. Defendants BCDC Admin S. Verch, Walt Pesterfield and Jennifer Magin are not named in any of Mr. Swain's additional filings and no specific allegations of wrongdoing are attributed to any of them. *See generally* ECF Nos. 6, 7, 9, 11, 13, 14, 15, 19, 27, 38, 39 and 42. While Defendant Siskor-Sirleaf is identified in a supplement to the complaint (ECF No. 38), Mr. Swain asserts only that she assisted him in

leaving the medical ward. *Id.* In light of the foregoing, the Court finds that Mr. Swain failed to state a claim against Defendants BCDC Admin S. Verch, Walt Pesterfield, Jennifer Magin or Hillary Siskor-Sirleaf and they are entitled to dismissal.

In his response in opposition, Mr. Swain asserts that the individually named County Defendants became aware of his need for THC/CBD when he filed an administrative grievance. ECF No. 56 at 3. Such a claim is also unavailing because the processing of grievances filed by Mr. Swain, without more, is insufficient to impose liability. *See Gallagher v. Shelton*, 587 F. 3d 1063, 1069 (10th Cir. 2009) (holding allegation that warden "rubber stamped" grievances was not enough to establish personal participation); *Prince v. Crabtree*, No. 23-875, 2024 WL 1442193 at * 7 (D. Md. Apr. 3, 2024) ("[D]enial of grievances alone is insufficient to establish personal participation in the challenged constitutional violation,") (citing *Whitington v. Ortiz*, 307 F. App'x 179, 193 (10th Cir. 2009))).

In short, Mr. Swain's claims are devoid of any allegation that the individually named County Defendants were personally involved in his medical care or the alleged violation of his rights under the ADA. And so, the complaint must be dismissed as to Defendants BCDC Admin S. Verch, Walt Pesterfield, Jennifer Magin and Hillary Siskor-Sirleaf.

**B. Medical Care**

It is unclear whether Mr. Swain was a pretrial detainee or convicted inmate at the relevant time. The records indicate that he was initially detained on a probation violation and ultimately found guilty of that offense. ECF No. 51-3. Thus during the relevant time period, he appears to have been both a pretrial detainee and then a convicted inmate.

The Due Process Clause of the Fourteenth Amendment protects the rights of pretrial detainees to receive adequate medical care. *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (stating that "the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care" to pretrial detainees "who require it" (citation omitted)). In contrast, once convicted and serving a sentence, claims would be brought under the Eighth Amendment, which prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition protects inmates from "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976) (citations omitted). The court will review the claims under both the Eighth and Fourteenth Amendments.

The Fourteenth Amendment "protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" *Short v. Hartman*, 87 F.4th 593, 608-09 (4th Cir. 2023) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015)). "To state a claim of deliberate indifference to a medical need . . . a pretrial detainee must plead that (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed." *Id.* at 611. This means that a pretrial detainee "no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Id.*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg*, 428 U.S. at 173; U.S. Const. amend. VIII; *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, that the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or ensure it was available. *See Farmer v. Brennan*, 511 U.S. 825, 834-37 (1994); *see also Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 209-10 (4th Cir. 2017); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (finding that there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v.*

*Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko*, 535 F.3d at 241); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839-40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his[/her] actions were inappropriate in light of that risk.'" *Anderson v. Kingsley*, 877 F.3d 539, 545 (4th Cir. 2017) (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

In this case, the evidence demonstrates that Mr. Swain merely disagrees with the treatment provided. Mr. Swain's allegations that Dr. Barnes, or any other of the named Defendants, acted improperly when providing medical care to him and/or prescribed a course of treatment with which he disagreed (*i.e.*, refused to provide him access to medical marijuana) are insufficient to state a viable Eighth Amendment claim. *See, e.g.*, *Farmer*, 511 U.S. at 835 ("[D]eliberate indifference entails something more than mere negligence." (citation omitted)); *Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Scinto*, 841 F. 3d at 225; *see, e.g.*, *Harris v. Lake County Jail*, 2012 WL 1355732, *4-5 (N.D. Cal. Apr. 18, 2012) (holding that the plaintiff

failed to state a deliberate indifference claim based on the denial of medical marijuana, because there is no constitutional right to demand jail officials provide a plaintiff with medicine of his choosing, including medical marijuana) (collecting cases holding same).

Mr. Swain has failed to set forth sufficient evidence to demonstrate that any of the named Defendants knowingly failed to provide constitutionally adequate medical care for an objectively serious medical need or that they acted with deliberate indifference to that need. Mr. Swain does not allege, much less demonstrate that THC or CBD are commonly used or prescribed by medical professionals to control epileptic seizures or that alternative treatments were not available to him. To the contrary, the uncontroverted medical records demonstrate that Mr. Swain was consistently provided with the medications prescribed to him by his treating neurologist and that appropriate medical orders were entered to ensure his safety and monitoring.

The record demonstrates that during his intake, Mr. Swain reported that he suffered from seizures which were managed by his taking Clobazam, Briviact an Aptiom. Dr. Barnes ordered the administration of those medications daily. When Mr. Swain complained to Dr. Barnes that he also needed CBD or THC to control his seizures and that Dr. Krauss would confirm the same, Dr. Barnes immediately contacted Dr. Krauss's office. The office reported, contrary to Mr. Swain's representations, that Dr. Krauss had not prescribed CBD. Dr. Barnes advised Mr. Swain that he would not receive CBD/THC at BCDC. Mr. Swain's condition was actively managed and his health monitored. The record further demonstrates that Dr. Barnes made sincere efforts to address all of Mr. Swain's medical issues and she was not deliberately indifferent to Mr. Swain's serious medical needs. And so, Dr. Barnes is entitled to summary judgment on this claim.

**C. ADA**

Title II of the ADA, prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," 42 U.S.C. § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132. To state a cause of action under Title II of the ADA, an individual must plausibly allege that: (1) he has a disability or has been regarded as having a disability; (2) he is otherwise qualified to receive the benefits provided by a public entity; and (3) he was denied those benefits or was otherwise discriminated against on the

basis of his disability. *See Wicomico Nursing Home v. Padilla*, 910 F.3d 739, 750 (4th Cir. 2018).

While it is true that Mr. Swain, as a person who suffers from epilepsy, fits the definition of an individual with a disability, something much more than a conclusory statement that the ADA was violated is needed to state a claim. Here, Mr. Swain has failed to include factual allegations that show that these Defendants discriminated against him based on his disability. Nor does he assert any factual allegations to demonstrate that he was otherwise qualified to receive the benefits he claims he was denied, *i.e.* work assignment and access to programming. And so, his ADA claim must also be dismissed.

**D. *Monell* Claim**

Municipal liability may not be premised on a theory of respondeat superior. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "[A] municipality is liable only for its *own* illegal acts." *Owens v. Baltimore City State's Att''ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). Under *Monell*, a municipality may be liable under § 1983 only when its "policy or custom" causes a constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, (1978). A municipal policy or custom may be established:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train [or supervise] officers that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

*Blair v. Appomattox Cnty. Sch. Bd.*, 147 F.4th 484, 493 (4th Cir. 2025) (internal quotation marks omitted); *see also Connick v. Thompson*, 563 U.S. 51, 60-61 (2011).

*Monell* liability has been extended to private entities operating under color of state law, including private prison health care providers. *See, e.g.*, *West v. Atkins*, 487 U.S. 42, 49 (1988); *Polk Cnty. v. Dodson*, 454 U.S. 312, 320 (1981); *Rodriguez v. Smithfield Packing Co.*, 338 F.3d 348, 355 (4th Cir. 2003); *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999). Thus, those standards applicable to municipalities apply with full force to Defendant PrimeCare Medical Inc. *See Rodriguez*, 338 F.3d at 355 (observing that principles of § 1983 municipal liability "apply equally to a private corporation" acting under color of state law (citation omitted)).

To the extent Mr. Swain asserts that Baltimore County or PrimeCare Medical, Inc. maintain an unconstitutional policy prohibiting his use of THC/CBD, that assertion is unsupported by factual allegations from which such a policy or custom could be inferred. *See Board of County Com'rs of Bryan County, Okl. v. Brown v*, 520 U.S. 397, 415 (1997). Mr. Swain pleads only his own single encounter and offers conclusory allegations regarding the denial of THC/CBD to him. Such "[t]hreadbare recital [] of the elements" cannot establish deliberate indifference or the existence of any widespread practice. *Iqbal*, 556 U.S. at 678.

Moreover, even if Mr. Swain had properly supported his claim that Baltimore County or PrimeCare Medical Inc. had a policy or custom that denied him access to medically necessary THC/CBC, the complaint fails because Mr. Swain cannot establish that such a policy violated his rights. During Mr. Swain's incarceration, the Controlled Substances Act ("CSA") categorized marijuana fully as a Schedule I drug with a "high potential for abuse, lack of any accepted medical use, and absence of any accepted safety for use in medically supervised treatment." *Gonzales v. Raich*, 545 U.S. 1, 14 (2005) (citing 21 U.S.C. § 812(b)(1) and (c)); *see also* 21 U.S.C. § 812(c)(Schedule I)(c)(17) (classifying THC as a Schedule I substance); *United States v. White Plume*, 447 F.3d 1067, 1073 (8th Cir. 2006) ("The plain language of the CSA states that Schedule I(c) includes 'any material ... which contains any quantity of [THC],' and thus such material is regulated." (alteration in original)).[6] At the time of Mr. Swain's incarceration, marijuana was "contraband for any purpose" under federal law, *Raich*, 545 U.S. at 27, including for medical purposes, *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 486-91 (2001) (discussing physician-prescribed marijuana and noting "for purposes of the [CSA], marijuana has no currently accepted medical use" (citation omitted)); *see also United States v. Harvey*, 659 F.3d 1272, 1274 (9th Cir. 2011) (affirming a district court's revocation of supervised release, based on its determination that a defendant's use of marijuana, pursuant to a physician's recommendation, was unlawful under federal law). Thus, Mr. Swain cannot establish that such a policy that prohibited his use of medical marijuana was improper.

[6] The Executive Branch has recently moved FDA-approved products containing marijuana and marijuana products regulated by a state medical marijuana license to Schedule III of the CSA. *See generally* 21 CFR Parts 1300, 1301, 1308, 1312; *Justice Department Places FDA-Approved Marijuana Products and Products Containing Marijuana Subject to a Qualifying State-issued License in Schedule III, Strengthening Medical Research While Maintaining Strict Federal Controls*, U.S. Office of Public Affairs, https://www.justice.gov/opa/pr/justice-department-places-fda-approved-marijuana-products-and-products-containing-marijuana (last visited Aug. 27, 2026).

Additionally, to the extent Mr. Swain asserts that there is a policy that denies a person with a history of seizures from working or attending gym, his claim also fails. Mr. Swain's claim appears to arise from Dr. Barnes' decision to place him on these restrictions due to his reported history of seizures and recent daily seizure activity. Mr. Swain fails to allege and offers no evidence that Baltimore County or PrimeCare has such a policy and that the decision to restrict Mr. Swain's access was based on such a policy rather than on his particular medical and safety needs. Mr. Swain has not alleged, and cannot demonstrate, that Baltimore County or PrimeCare had such a policy or that the policy demonstrated deliberate indifference to his medical needs. In short, there is no factual allegation that either Baltimore County or PrimeCare are responsible for a policy that impacted Mr. Swain's ability to earn diminution credits.

In light of the foregoing, the Court finds that Mr. Swain has failed to state a claim against Baltimore County and PrimeCare Medical, Inc. under *Monell*. And so, the Court must also dismiss the complaint as to these Defendants.

## V. CONCLUSION

For the foregoing reasons, Defendants' dispositive motions are granted (ECF Nos. 44, 51 and 52).[7] A separate Order follows.

September 1, 2026
Date

LYDIA KAY GRIGGSBY
United States District Judge

[7] In light of the Court's findings, the Court does not address the Defendants' additional arguments in support of their motions. Further, to the extent that Mr. Swain intended to assert any state law claims, those claims are dismissed without prejudice. "When, as here, the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." *Carnegie Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726-727 (1966)).